# UNITED STATES DISTRICT COURT
# MIDDLE DIVISION OF FLORIDA
# JACKSONVILLE DIVISION

**UNITED TRANSPORTATION UNION,**

    Plaintiff,

v.                                                       Case No.: 3:08-cv-374-J-16HTS

**CSX TRANSPORTATION, INC.,**

    Defendant.

_____/

## ORDER

This case is before the Court on the issue of how temporary vacancies are filled when a freight train conductor is temporarily unavailable to fill his or her regular assignment. Plaintiff claims that it is entitled to injunctive relief on the issue, while Defendant claims that the Court lacks subject matter jurisdiction to hear the case. The parties filed cross-motions for summary judgment (Dkts. 17 and 19) and corresponding responses in opposition (Dkts. 20 and 21) which are now pending before the Court. For the reasons that follow, Plaintiff's Motion for Summary Judgment (Dkt. 17) will be **DENIED** and Defendant's Motion for Summary Judgment (Dkt. 19) will be **GRANTED**.

    **I.**     **Factual Background**[1]

Defendant, CSX Transportation, Inc. ("CSX") is a rail carrier operating throughout the eastern United States. The "CSX system" consists of a series of former railroad lines - the Seaboard Coast Line Railroad ("SCL"), the former Louisville & Nashville Railroad ("L&N"), the former Chesapeake & Ohio Railway ("C&O"), the former Baltimore & Ohio Railroad ("B&O") and a

---

[1] All facts are taken from the parties' filings.

portion of the former Consolidated Rail Corporation ("Conrail"). The SCL, L&N and the C&O are at issue in this case.[2]

CSX operates trains in different kinds of service, including "through-freight" service. Through-freight service describes trains that generally operate between two terminals, making few, if any, stops. An engineer and conductor are the typical crew on a through-freight train. CSX calls conductors to work on through-freights from a "pool" of conductors based at a particular terminal, this is commonly known as "pool service." The "pool" is a roster of employees that CSX calls to work on assignments operating between particular terminals. Each position on the pool roster is referred to as a "turn," and each turn corresponds to a one-way assignment for a single employee to crew a train traveling between two terminals serviced by the pool. Qualified employees bid for slots in a particular pool based on seniority, with a successful bid resulting in the assignment of a specific slot or "turn" on that pool list.

Plaintiff, United Transportation Union ("United") is a labor organization that represents CSX's conductors. United and CSX are parties to various collective bargaining agreements ("CBA" or collectively, the "CBAs") that govern the terms and conditions of employment for CSX's conductors. United uses semi-autonomous mid-level bodies called General Committees of Adjustment ("GCA") to carry out its representational function. The GCAs are headed by a General Chairperson ("GC"), who is the highest designated union officer for resolving disputes on property. The GCAs negotiate and police the CBAs under their jurisdiction. Jurisdiction is generally drawn

---

[2] United's Motion for Summary Judgment (Dkt. 18, pp. 5-6) details the "dropping" of certain "pool turns" at the SCl, C&O and L&N properties from 2007-2008. "Pool turns" are defined and discussed in the main body of the Order.

along former rail carrier lines or geographically. Each GCA has its own agreement(s) with CSX covering the terms and conditions of employment, including "pool turns" or "pool service."

Through-freight trains do not operate on a fixed schedule. Because of this, conductors assigned to pools staffing through-freight trains are called for their assignments by CSX's Crew Management Center ("CMC") several hours before the train they are expected to crew is set to depart. Federal law requires that a crew receive a set amount of rest in between assignments. The CMC may call a rested conductor in the pool to work at any time unless he or she has marked off time for a sanctioned, legitimate reason.

The CBAs include procedures for calling conductors in the pool service to report for duty. Under the CBAs, CSX generally calls conductors on a "first-in-first-out" basis. This means that the conductor holding the first spot at a particular terminal takes the first turn, or assignment out of the terminal. Upon arrival at the train's destination, that conductor is added back to the turn list in order of his or her arrival.

Occasionally, and for a myriad of reasons, turns on a pool list become "vacant." When vacancies occur, CSX cannot provide the crew necessary to run that freight train and a "bottleneck" is created at the terminal, which can delay trains throughout the CSX system. The CBAs each contain procedures for filling temporary vacancies, known as "fill vacancy logics."[3] Fill vacancy logics require that CSX engage in certain specific steps for calling different lists of employees to fill a temporary vacancy. However, at times, even after exhausting these specific steps, CSX is unable

---

[3] The vacancy fill logic steps provided in the parties collective bargaining agreements have, in some instances, been modified or supplemented by written side agreements, unwritten local agreements and past local practices. (Dkt. 19 at p. 6, n.4, listing some of these side agreements and correspondence).

to find a conductor to fill a turn for a train operating in pool service out a particular terminal. If CSX completes the fill vacancy logics and still has a vacancy, it may decide to "drop" the vacant turn. When CSX drops a turn, the CMC takes the vacant first-out turn and "drops" it to the bottom of the pool list so that it becomes the last-out turn, and the second-out turn moves up the list to become the first-out turn, etc.[4]

Under the Railway Labor Act ("RLA"), 45 U.S.C. § 151 *et seq.*, CSX and United must "make and maintain" agreements (45 U.S.C. § 152 First) and can only change those agreements through a specific bargaining procedure initiated by a "Section 6 Notice." 45 U.S.C. § 156 (which requires thirty days' written notice of an intended change in agreements affecting "rates of pay, rules or working conditions . . .").

Section 2 Seventh of the RLA, 45 U.S.C. § 152 Seventh, reads, in pertinent part that:

> No carrier, its officers or agents shall change the rates of pay, rules or working conditions of its employees as a class as embodied in agreements except in the manner prescribed in such agreements or in section 156 of this title.

The above provisions dictate neither party may change the status quo with regard to existing agreements and practices without first filing a notice of such intended change as required by Section 6 of the RLA. The filing of a Section 6 Notice triggers a mandatory period of bargaining, mediation by the National Mediation Board under Section 5 of the RLA, 45 U.S.C. § 155, and the possible appointment of an Emergency Board by the President of the United States under Section 10 of the RLA, 45 U.S.C. § 160.

---

[4] When a turn is dropped, it is moved from the top of the pool list to the bottom of the pool list. When a turn is skipped, however, the turn remains at the top of the list, so that the conductor in question will remain first-out once he or she has received the required period of rest.

Courts interpreting the RLA's dispute resolution procedures, characterize labor disputes as either "major" or "minor." A "major dispute" is defined as the unilateral change of an agreement. The appropriate remedy for a 'major dispute" is preliminary injunctive relief from the appropriate federal district court, so as to maintain the "status quo" under the affected agreement(s). A "minor dispute" is defined as one that involves the interpretation of a contract provision. Mandatory arbitration is required to resolve "minor disputes." Under Section 3 of the RLA, a federal district court does not have subject matter jurisdiction to resolve a "minor dispute."

The primary purpose of the RLA is to avoid interruptions to carrier operations, and courts must resolve any doubts in favor of finding a minor dispute, so that the dispute can be channeled into the proper dispute resolution procedures without disrupting rail service. Consul Rail Corp. v. Ry. Labor Executives' Ass'n, 491 U.S. 299, 310 (1989).

**II.     Standard of Review**

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

In determining whether to grant summary judgment, the Court must view the evidence and inferences drawn from the evidence in the light most favorable to the non-movant and resolve all reasonable doubts in that party's favor. Augusta Iron & Steel Works, Inc. v. Employers Ins. of Wausau, 835 F.2d 855, 856 (11th Cir. 1988); WSB-TV v. Lee, 842 F.2d 1266, 1270 (11th Cir. 1988). The Eleventh Circuit explained in Lee that:

> In deciding whether an inference is reasonable, the Court must "cull the universe of possible inferences from the facts

5

> established by weighing each against the abstract standard of reasonableness." [citation omitted]. The opposing party's inferences need not be more probable than those inferences in favor of the movant to create a factual dispute, so long as they reasonably may be drawn from the facts. When more than one inference can be reasonably drawn, it is for the trier of fact to determine the proper one.

Id.

Thus, if a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant the summary judgment motion. See Augusta Iron & Steel Works, Inc., 835 F.2d at 856.

**III. Discussion**

The parties' central dispute is whether CSX can use the vacancy-filling process for its train crews, known as "dropping-turns." United argues that the CBAs prohibit CSX from "dropping-turns" and that CSX has acknowledged this prohibition. United defines the dispute at issue as a "major dispute" and claims that the Court must resolve the dispute because the appropriate remedy for CSX's "blatant" violation of the CBAs is an injunction under the above-referenced sections of the RLA.

CSX claims that there is nothing in the CBAs to prevent it from dropping turns after it has exhausted the appropriate fill logic steps and still has been unable to locate a rested conductor to fill the temporary vacancy. CSX informs the Court that it has been "dropping-turns" for years without challenge from United. Finally, CSX argues that regardless of how the "dropping-turns" dispute is resolved, it is not of concern to this Court. CSX claims that because the dispute's resolution turns on the interpretation and application of the parties' existing CBAs, it is a "minor dispute" under the RLA, which can only be resolved through mandatory and binding arbitration.

A dispute is "minor" as long as the carrier's interpretation of existing agreements is "arguably justified," not "frivolous," or not "obviously insubstantial." Consul Rail Corp. V. Ry. Labor Executives' Ass'n, 491 U.S. 299, 310 (1989). The burden to establish a minor dispute is relatively light. Id. at 307. In making this determination, the role of the district court is narrow, the court can neither interpret the contract nor decide which party's interpretation is correct. A district court should also not assess the relative merits of the parties' competing interpretations. Id. at 318-19. Instead, the court is limited to asking only whether the dispute "on its face is governed by the contract." United Steelworkers v. Am Mfg. Co., 363 U.S. 564, 568 (1960).

CSX claims that its interpretation of the CBAs permits it the flexibility to drop turns after exhausting the applicable vacancy fill logic. CSX acknowledges that the CBAs do not specifically contemplate what procedures should be followed after exhaustion to fill a temporary vacancy. CSX clams that courts recognize that written collective bargaining agreements in the railroad industry do not address every contingency. See Empresa Equatoriana de Avicacio, S.A. v. Dist. Lodge, 690 F.2d 839, 843 (11 th Cir. 1982). United claims that "provisions" of the CBAs prohibit CSX from dropping turns under any circumstance. United points to certain side agreements and correspondence between the parties that it claims prohibit dropping turns. United also claims that CSX has acknowledged in writing that the CBAs specifically prohibit dropping turns. United fails, however, to provide the Court with the specific or any CBA provision that prohibits dropping turns. What is clear from the parties' competing arguments is that this dispute is clearly based on the parties interpretation of the parties' CBAs - United claims the provisions themselves prohibit the practice and CSX claims that it can drop turns because the CBAs' provisions do not categorically deny them that ability once the fill logic procedures have been exhausted.

CSX attempts to bolster its arguments by citing to its long-standing practice of dropping turns and calling the Court's attention to United's "recent" ire with this "long-standing" practice. United claims that the evidence CSX provides the Court to demonstrate its "long-standing" past practice of dropping turns is essentially useless. In support of its arguments, United refers to a series of correspondence between the parties consisting of side agreements, letter agreements, etc. that it claims make clear that CSX understood that it could not drop turns unless it obtained (through bargaining) an agreement expressly authorizing it to do so. <u>See</u>, <u>e.g</u>. Dkt. 19 at p. 13; <u>see also</u> Compl. ¶ 32). CSX claims that these side agreements and correspondence confirm what CSX is not disputing, namely that CSX is required to follow the vacancy fill logic provisions provided for in the CBAs. However, CSX claims that they fail to address the dispute at issue in this action - Do the CBAs prohibit the dropping of turns after CSX has exhausted the vacancy fill logic without filling the temporary vacancy? CSX also notes that like the CBAs, the side agreements and letters do not categorically prohibit CSX from dropping turns in any circumstance. (Dkt. 20 at p. 10).

Again, underlying these competing arguments is the inescapable conclusion that the parties' dispute is based on and can ultimately be resolved through the interpretation of <u>existing</u> agreements.

Despite the parties' prolific filings (and the occasional logical inconsistency of the arguments presented), the issue in this case is very narrow - Does resolution of this dispute require interpretation of the parties' CBAs? The answer is, categorically, yes.

Applying the deferential standard for "minor disputes" set out above, and given that the CBAs and practices upon which CSX relies arguably permit it to drop turns in certain circumstances, the Court finds that CSX's arguments are not "frivolous," thus, this is a "minor dispute" and subject to the mandatory arbitration requirements of the RLA.

8

The Court's conclusion is further buttressed by CSX's Motion for Summary Judgment (Dkt. 20, pp. 12-18). In its Motion for Summary Judgment, CSX carefully and thoroughly distinguishes each case cited by and relied upon by United. It is not necessary to repeat that information here, except to say that the Court also finds that the cited case law does not support United's claim that this is a "major dispute."

**IV.    Conclusion**

For the reasons set forth above, the Court finds that the record reveals that this dispute involves the interpretation and application of the parties' existing CBAs and that CSX's interpretation of those agreements is not frivolous. Thus, the parties' dispute is a "minor dispute" and as such is subject to mandatory arbitration. This Court, therefore, lacks subject-matter jurisdiction and must dismiss United's complaint.

Accordingly, the Court **ORDERS** that CSX's Motion for Summary Judgment (Dkt. 19) is **GRANTED** and United's Motion for Summary Judgment (Dkt. 17) is **DENIED**. The **Clerk** is directed to enter judgment for CSX and to **CLOSE** this case.

**DONE** and **ORDERED** from Chambers in Jacksonville, on this 23rd day of February 2009.

_____
JOHN H. MOORE II
United States District Judge

Copies to:    Counsel of Record

9